AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☒ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
04/05/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ______________ DEPUTY

United States of America

v.

Fantraya Carter,

Defendant(s)

Case No. 2:20-MJ-01518

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 3, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Norman Tobias, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 5, 2020

*Judge's signature*

City and state: Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Norman Tobias, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Fantraya CARTER ("CARTER") for a violation of Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute Controlled Substances).

2.   This affidavit is also made in support of an application for a warrant to search CARTER's digital device seized from CARTER's person on April 3, 2020 (the "SUBJECT DEVICE"), in the custody of the Drug Enforcement Administration (DEA) in Los Angeles, California, as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my

knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II.   BACKGROUND OF SPECIAL AGENT NORMAN TOBIAS

5.   I am a Special Agent ("SA") with the Drug Enforcement Administration (DEA) and have been so employed since 1996.  I am currently assigned to the DEA Narcotics Task Force at the Los Angeles International Airport (the "DEA LAX Narcotics Task Force"), which investigates criminal enterprises that use the aviation system to transport large amounts of illicit drugs throughout the United States and the world.  The DEA LAX Narcotics Task Force consists of law enforcement officers from the DEA, the Los Angeles World Airports Police Department, the Los Angeles Police Department, and the Los Angeles County Sheriff's Department.

6.   As a DEA SA, I have been involved in over 1,000 drug-related investigations, including numerous investigations involving drugs being trafficked through the aviation system. In these investigations, I have conducted hundreds of interviews of informants, cooperating sources, and suspects, and I have personally arrested more than 250 drug-related offenders.  I am familiar with the ways in which drug smugglers and bulk cash smugglers use digital devices to facilitate and conceal their criminal activities.  Before joining the DEA, I was a Border Patrol Agent for the United States Border Patrol from August 1994 until July 1996.

2

### III. SUMMARY OF PROBABLE CAUSE

7. On or about April 3, 2020, Transportation Security Administration ("TSA") officers at Los Angeles International Airport ("LAX") found approximately 13 pounds of what appeared to be crystal methamphetamine in clear plastic bags contained within the carry-on bag belonging to CARTER, who was scheduled to fly on American Airlines flight #2826 to New Orleans, Louisiana, that same day. CARTER was detained pending further investigation. Initial testing of the suspected crystal methamphetamine was positive for methamphetamine. CARTER was arrested at the DEA LAX Narcotics Task Force (LAXNTF) office. CARTER agreed to speak to law enforcement personnel after she was read her Miranda warnings, and she also verbally agreed to let investigators search her phone. CARTER signed a <u>Miranda</u> Rights/Waiver form but declined to sign a written Consent to Search form for her phone. During her post-arrest interview, CARTER admitted to packing her own bag, but she claimed that did not know how the crystal methamphetamine got into her bag. An initial review of CARTER's phone revealed a text conversation about CARTER doing this turnaround trip for $1,000.

### IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, as well as my own observations and knowledge of the investigation, I am aware of the following:

**A. TSA Agents Discover Drugs in CARTER's Carry-On Bag**

9. According to the LAX Police Department ("LAXPD") reporting related to incident number 20-065864, on or about

3

April 3, 2020, at approximately 4:40 p.m., TSA Officer Juliu Garcia was assigned to conduct security screenings of carry-on bags in the LAX Terminal 5 passenger screening station, lane 3. Officer Garcia saw an alert on the screening machine indicating the machine had identified a suspicious bulk mass inside a duffle bag.

10. Officer Garcia removed the duffle bag from the screening machine, which was a blue Nike duffle bag. TSA Officer Brandon Eberherdt was in the same area and asked CARTER if the flagged bag was hers. CARTER replied, "Yes." Officer Eberherdt then opened and searched the bag for any hazardous materials. During the search, Officer Eberherdt discovered a white substance wrapped in plastic bags. Officer Eberherdt then contacted TSA Supervisor Garcia to request LAXPD assistance.

11. LAXPD Officer C. Clady was nearby and responded to the area at approximately 4:45 p.m. LAXPD Officer Clady asked CARTER if she had packed her own bag. CARTER stated she did pack her own bag but that she did not know what was in it. After observing what appeared to be narcotics in the blue Nike duffle bag, LAXPD Officer Clady detained CARTER and requested the assistance of LAXPD Officer Hurd who is trained as a drug recognition expert (DRE).

12. LAXPD Officer Hurd subsequently determined the suspected narcotics in CARTER's bag to be crystal methamphetamine. LAXPD Officer Clady then called DEA SA Norman Tobias of the LAXNTF. I advised that LAXNTF personnel would be responding to LAX with a one-hour estimated time of arrival.

LAXPD personnel then transported CARTER and her bag containing the crystal methamphetamine to the LAXPD station.  Prior to LAXNTF personnel arriving, LAXPD Officer Clady determined there were 13 separate packages of crystal methamphetamine in CARTER's bag.  LAXPD Officer Clady numbered and dated each package with a permanent marker.

13. At approximately 6:30 p.m., SA Shawna Johnson and I arrived at the LAXNTF office.  LAXPD Officer Clady and other LAXPD Officers arrived soon after with CARTER and her duffle bag containing the crystal methamphetamine.

14. After placing CARTER in the LAXNTF holding cell, I donned my personal protection equipment and began testing a couple of the 13 plastic packages with a TruNarc Raman spectrometer used for the rapid identification of suspected narcotics.  Both packages tested positive for methamphetamine.  Each of the 13 packages weighed approximately one pound, and the gross weight of all the crystal methamphetamine in a DEA evidence box was 14.8 pounds.

    **B.    CARTER's Post-<u>Miranda</u> Statements**

15. I read CARTER her <u>Miranda</u> warnings, as witnessed by SA Johnson, and CARTER signed a <u>Miranda</u> Rights/Waiver form stating that she was willing to speak with law enforcement.  CARTER said, in substance and in part, the following:

    a.  Earlier this day, at approximately 2:30 p.m., her sister, Shawntel Campbell, called her from New Orleans, Louisiana, and asked her to come to New Orleans.

   b. CARTER said she was planning on being there for two weeks. Besides the crystal methamphetamine, CARTER's bag contained a single change of clothes, some towels and no toiletries. CARTER further stated that she had packed jeans, food, underwear and shirts but that she did not know where those items had disappeared to.

   c. When asked about who would be taking care of her two minor children, ages 8 and 12, CARTER stated they would probably be staying with their auntie and their Dad.

  **C. Evidence Discovered on CARTER's Phone**

 16. CARTER also gave verbal consent to search her phone and provided her passcode to her phone, but she declined to sign a written Consent to Search form.

 17. A cursory search of CARTER's phone revealed that a person listed in Contacts as "FAVE" had been communicating with CARTER as follows:

  12:23 p.m. FAVE: Hey

  12:24 p.m. CARTER: Hi

  12:24 p.m. FAVE: U tryna travel?

  12:24 p.m. FAVE: Quick flight

  12:24 p.m. FAVE: Turn around

  12:24 p.m. FAVE: 1k

  12:24 p.m. FAVE: Today or tomorrow lastest

  12:29 p.m. CARTER: Do I need that new ID? if so I can't

  12:41 p.m. FAVE: No

  1:32 p.m. CARTER: Fantraya Carter, 11/24/1990 and

  trayacarter25@gmail.com

>1:43 p.m. FAVE: Done 530 (Investigator's note: American Airlines flight #2826 (AA2826) from LAX to New Orleans was scheduled to depart LAX at 5:35 p.m. This is the flight CARTER was booked on.)
>
>1:43 p.m. FAVE: Few hrs
>
>1:44 p.m. FAVE: He'll be yo way by 3
>
>1:45 p.m. FAVE: Get yo things together
>
>1:58 p.m. CARTER: Okay
>
>3:22 p.m. FAVE sends CARTER an Uber/rideshare confirmation that a driver will be arriving in 4 minutes "at your pickup spot on S Atlantic Dr" [Investigator's note: CARTER resides at 1214 S. Atlantic Drive in the city of Compton.]
>
>3:26 p.m. CARTER: Alright

18. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I believe this conversation illustrates that FAVE contracted with CARTER to be a drug courier on AA2826 in exchange for $1,000.

**V. TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING**

19. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Los Angeles is a major hub for drug distribution. Partly because of the close proximity of Los Angeles to the Mexican border, prices of drugs are generally lower here than prices on the east coast. Drugs enter Los Angeles from across the Mexican border or overseas from Asia and are then

distributed across the country.  LAX is commonly used to facilitate drug transportation for Drug Trafficking Organizations, who send their couriers through LAX with drugs in their luggage.  Numerous drug arrests are made at LAX every year, with couriers transporting drugs in checked bags.

      b.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      c.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      d.   Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs

between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.  It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  Based on my training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

        e.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

    f. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

20. As used herein, the term "digital devices" includes the SUBJECT DEVICE.

21. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

11

22. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

   c.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital devices, operating system, and software application being searched.

   d.   Although some of the records called for by this warrant might be found in the form of user-generated documents

(such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital devices, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a

controlled laboratory environment, and also can require substantial time.

23. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

24. Based on the foregoing, there is probable cause to believe that Fantraya CARTER violated Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and that evidence of the Subject Offenses as described in Attachment B will be found on the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this fifth day of
April, 2020.

_____
THE HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE